# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DittoLive, Incorporated,

        Plaintiff,

v.

Defense Unicorns, Inc. and Kit
Plummer,

        Defendants.

Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff DittoLive, Incorporated ("Ditto") alleges the following against Defendants Defense Unicorns, Inc. ("Defense Unicorns") and Kit Plummer ("Plummer") (together, "Defendants").

## INTRODUCTION

1. This action concerns Defense Unicorns and Plummer's theft of Ditto's confidential and trade secret information, improper use of proprietary Ditto technology, and unlawful recruitment of Ditto employees.

2. Ditto's edge-native, mobile database solves a problem that has long plagued mission-critical operations: keeping systems running when connectivity fails. Ditto's product allows its customers—including the U.S. Government—to synchronize and access data in real time even without a reliable internet connection,

and to build flexible operations, decentralize their systems, and drive consistent revenue and customer service. The value of Ditto's product lies in the specific, proprietary way Ditto built, implemented, and refined its system to work reliably in the field. Ditto has devoted more than a hundred million dollars and close to eight years of engineering effort to develop and implement the product as well as the confidential expertise behind it.

3.      Defense Unicorns wanted to compete with Ditto in the defense contracting space. Rather than invest the years of trial and error required to build such technology from scratch, however, Defense Unicorns took a shortcut. It hired Plummer—a former Ditto engineer who spent years learning Ditto's confidential, proprietary, and trade secret information and who, after leaving the company, retained unauthorized access to Ditto's systems. With the benefit of the confidential, proprietary, and trade secret information he learned while employed by Ditto, Plummer began to build a competing distributed mesh architecture platform (and derivative products) known as "HIVE," brought this technology with him to Defense Unicorns, and has continued to use Ditto's confidential, proprietary, and trade secret information and assets to develop a competing platform and products for Defense Unicorns.

4.     Ditto brings this action to stop the ongoing theft of its trade secrets, cut off unauthorized access to its systems, and uncover the full scope of Defendants' wrongdoing before more damage is done.

## THE PARTIES

5.     Plaintiff Ditto is a Delaware corporation with a principal place of business in Atlanta, Georgia. Ditto develops and deploys proprietary edge-native, mobile database software for large companies, such as Alaska Airlines, Chick-fil-A, and Lufthansa, and for defense contracts with the U.S. Government, including the United States Air Force.

6.     Defendant Defense Unicorns is, on information and belief, a privately held Delaware corporation with headquarters in Colorado Springs, Colorado. Defense Unicorns is a technology start-up focusing on open architecture software build, accreditation, and deployment platforms for defense contractors and the U.S. Government. It recruits employees from across the United States and currently employs Plummer.

7.     Defendant Plummer is an individual who, on information and belief, resides in or around Atlanta, Georgia. Plummer executed employment and confidentiality agreements with Ditto on February 16, 2023. He executed a separation agreement with Ditto on September 29, 2025.

## JURISDICTION AND VENUE

8.    This Court has original subject matter jurisdiction of the asserted federal claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state and common law claims pursuant to 28 U.S.C. § 1367 because they are part of the same case or controversy.

9.    This Court has personal jurisdiction over Defense Unicorns because it employs and directs the conduct of its agent Plummer, a resident of Georgia. Additionally, Defense Unicorns intentionally directed its actions towards Ditto in Georgia and harmed Ditto in Georgia, rendering the exercise of jurisdiction by Georgia courts permissible under traditional notions of fair play and substantial justice.

10.    This Court has personal jurisdiction over Plummer because he lives in and conducts business in Georgia, because he engaged in the conduct giving rise to this Complaint in Georgia, and because he has sufficient minimum contacts to render the exercise of jurisdiction by Georgia courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b)(1) and (b)(2) because Plummer resides in this District and because a

substantial portion of the events or omissions giving rise to the claims occurred in this District. Additionally, the harm to Ditto was felt in this District.

<u>**FACTUAL ALLEGATIONS**</u>

***Ditto's History and Technology***

12.     Ditto was founded in 2018 to solve a fundamental problem in data infrastructure: applications that break when the internet does. Ditto founders Max Alexander and Adam Fish recognized that building great software applications requires great user interfaces—not engineering workarounds for unreliable connectivity. Their answer was Ditto: a distributed database and mesh transport layer that enables data to be accessed anytime, anywhere, and on any device.

13.     Ditto's cutting-edge technology synchronizes data across Bluetooth, peer-to-peer WiFi, and local wired networks, completely bypassing central servers.

14.     Ditto's technology drew immediate interest from airlines, point-of-sale companies, restaurants, and manufacturers—industries where unreliable connectivity meant lost revenue and broken operations. An application built with Ditto's technology, for example, allows airline crew members to process passengers' food and beverage orders from the crew members' tablets or phones, even when WiFi connectivity is interrupted mid-flight.

15.     Because it can run anywhere, Ditto's edge-native, mobile database offers a solution to connectivity challenges in the most mission-critical

environments, including aviation and defense. In the field, Ditto's product synchronizes critical data between devices over whatever transport is available, including Bluetooth, peer-to-peer WiFi, MANET radios, GoTenna, and SATCOM links, and uses multi-hop relays to extend the reach of communications across dynamic operational theaters. Ditto's technology allows field-deployed teams to maintain situational awareness and make mission-critical decisions even when network infrastructure is compromised or unavailable.

16.    Ditto's edge-native, mobile database was the first product on the market to offer peer-to-peer data synchronization. Perhaps just as valuable as the concepts underlying its database product, however, is what Ditto learned while building that product to work under real-world conditions. Through years of deploying its product in the field, Ditto has developed confidential, experiential know-how, including designs, methodologies, approaches that failed, and fixes that succeeded, that makes its database reliable where others are not. This is what makes Ditto's platform not just innovative, but battle-proven. As government agencies and defense organizations push operations to the tactical edge, Ditto meets their need for resilient, secure, and decentralized data systems.

***Ditto's Protection of Its Confidential, Proprietary, and Trade Secret Information***

17.    Ditto treats its technology and source code as the crown jewels they are. Because Ditto's innovative technology derives value specifically from its secrecy,

Ditto takes numerous measures to safeguard it. These measures include, without limitation: requiring employees, consultants, and advisors to enter into confidentiality agreements; implementing and enforcing employee policies; conducting regular trainings regarding confidentiality and the proper use of Ditto's data; sharing confidential information with outside partners only on a "need to know" basis, and even then only under non-disclosure agreements; password protecting Ditto's devices that maintain confidential information; keeping logs and other data documenting user access to Ditto's systems; maintaining physical security over Ditto's offices; maintaining access control and monitoring for servers and systems containing confidential information via centralized identities with SSO or managed internal passwords or keys; and other similar measures, all of which function as reasonable means to protect Ditto's confidential, proprietary, and trade secret information.

18.    Ditto is careful to enter into non-disclosure agreements with any third parties that have a need to access Ditto's confidential, proprietary, and trade secret information. Indeed, Defense Unicorns was aware of the protections Ditto had in place, as it entered into a non-disclosure agreement with Ditto on May 12, 2025 prior to the exchange of information in connection with the parties' evaluation of a potential business relationship.

19.    Ditto employees are further required to read and affirmatively acknowledge their understanding of and compliance with corporate policies that remind the employees of their obligations regarding the proper handling of Ditto confidential information and assets. These policies include: (a) strict guidelines on engaging in private or personal business activities; (b) restrictions on accessing networks, servers, drives, folders, or files to which the employee has not been granted access or authorization from someone with the right to make such a grant; (c) prohibitions on making unauthorized copies of Ditto files or other data; (d) responsibilities for reporting an incident of unauthorized use or access to Ditto's information systems; (e) restrictions on posting confidential data in public forums, social media, or chat rooms; and (f) emphasizing Ditto's intellectual property rights (e.g. patents, trademarks, copyrights, trade secrets, and "know-how") as being valuable assets that must be protected. Plummer consistently acknowledged his understanding of Ditto's policies regarding its intellectual property and confidential information and the surrounding requirements during his tenure at Ditto.

20.    Additionally, as a condition of employment, Ditto requires all employees to sign an Employee Invention Assignment and Confidentiality Agreement (the "Confidentiality Agreement"). A true and correct copy of Plummer's Confidentiality Agreement is attached to this Complaint as Exhibit 1 and is incorporated by reference. The Confidentiality Agreement obligates employees to

protect and refrain from disclosing to third parties confidential information acquired during the employee's tenure at Ditto. These obligations continue during and after employment with Ditto.

21.    The Confidentiality Agreement covers all manner of Confidential Information, including "Assigned Inventions, marketing plans, product plans, designs, data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, customer and supplier lists, and the non-public names and addresses of the Company's customers and suppliers, their buying and selling habits and special needs." Exhibit 1 § 8.

22.    In signing the Confidentiality Agreement, employees attest that: "I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose any Proprietary Information without the prior written consent of the Company in each instance, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company." Exhibit 1 § 9.

23.    Employees further agree that "Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information." Exhibit 1 § 9.

24. Upon leaving Ditto, employees who receive a severance package affirmatively reaffirm their obligation to maintain the confidentiality of Ditto's confidential, proprietary, and trade secret information in a Confidential Separation Agreement (the "Separation Agreement"). A true and correct copy of Plummer's Separation Agreement is attached to this Complaint as Exhibit 2 and is incorporated by reference. Specifically, the Separation Agreement states that the former employees agree they will "continue to be bound by and comply with the terms of the Confidentiality Agreement, including, without limitation, any non-solicitation provisions of such agreement" and that they will "return to the Company, in good working condition, all Company property and equipment that is in Employee's possession or control, including, but not limited to, any files, records, computers, computer equipment, cell phones, credit cards, keys, programs, manuals, business plans, financial records, customer or partner information, and all documents (whether in paper, electronic, or other format, and any copies thereof) that Employee prepared or received, or to which Employee had access, in the course of Employee's employment with the Company." Exhibit 2 ¶ 6.

***Plummer's Tenure at Ditto***

25. Plummer joined Ditto as a Staff Engineer effective March 1, 2023. In that role, Plummer worked with Ditto's most sensitive technology and most important public sector customers. He had access to, and worked directly with,

10

Ditto's trade secrets, including: (a) the specific manner in which Ditto implements its mesh architecture within its own system, including Ditto's particular implementation of edge synchronization, routing, transport, discovery, persistence, and conflict-resolution functionality, developed over years of engineering investment; (b) Ditto's proprietary source code and repository history, including code relating to mesh networking and CoT/TAK bridge functionality; (c) Ditto's negative know-how, such as the non-public record of the approaches, designs, and configurations Ditto tried and rejected, and the workarounds and fixes Ditto developed through years of real-world deployment; (d) Ditto's implementation-specific systems, including its DQL query language, its CoT/TAK bridge and TAK Edge Sync plugin, its offline-token and credential infrastructure, its autonomous systems designs and mesh synchronization within the Common Operational Database (COD), and its DiSCO and LightFish integrations; (e) Ditto's internal technical documentation, product roadmaps, and integration specifications; and (f) Ditto's customer and pipeline information, operational know-how, and other competitively sensitive business information. Ditto's trade secrets are used in interstate commerce.

26. Plummer's access extended beyond Ditto's finished product. He was privy to the internal record of what had been tried and failed—the dead ends, workarounds, and hard-won fixes that represented years of engineering trial and

11

error. This "negative know-how" is among Ditto's most important and closely guarded trade secrets.

27. As discussed above, Ditto employees, including Plummer, receive training and are regularly required to review and acknowledge policies regarding the importance of Ditto's trade secret information and the need to maintain its confidentiality. Plummer understood that Ditto's trade secrets were among the company's most valuable assets.

28. As a condition of his employment, Plummer signed the Confidentiality Agreement on February 16, 2023, binding himself to the full scope of its protections during and after his employment.

29. In addition to agreeing in the Confidentiality Agreement to maintain Ditto information as confidential, Plummer also confirmed that "[d]uring my employment with the Company and for a one (1) year period thereafter, I will not directly or indirectly solicit away employees or consultants of the Company…." Exhibit 1 § 14.

30. Plummer's employment with Ditto ended on September 19, 2025. Upon his departure, Plummer entered into the Separation Agreement in which he reaffirmed his obligations not to misuse or disclose Ditto confidential information or recruit Ditto employees, and confirmed that he would "return to the Company, in

good working condition, all Company property and equipment that is in Employee's possession or control." Exhibit 2 ¶ 6.

***Plummer and Defense Unicorns' Theft of Ditto Trade Secrets***

31.    Unbeknownst to Ditto, Plummer's departure did not end Plummer's access to and use of Ditto's trade secret information. Instead, it began a new phase of unauthorized and surreptitious access and use.

32.    Specifically, Plummer used Ditto's trade secrets to build a competing mesh networking platform and derivative products (that he called "HIVE") and is continuing to develop these products for his new employer, Defense Unicorns, under the name "PEAT."

33.    On its GitHub repository, Defense Unicorns describes its PEAT platform as "[a] mesh protocol that connects heterogeneous systems—phones, servers, sensors, embedded devices, AI models—into a coordinated whole, across any transport, even when the network is degraded or denied."

34.     Components of Defense Unicorns' PEAT platform reproduce the architecture of Ditto's technology. The source of that architecture is the confidential, proprietary, and trade secret information Plummer took from Ditto, e.g.,  PEAT's hierarchical design subsystems organization, its DQL query language "DQL-like custom queries ... full syntactic parity," its SDK behaviors including role-based decision making, its TAK Edge Sync plugin, and its BLE stack all mirror Ditto's.

35.    These are features Plummer worked on at Ditto. He knew precisely how each worked, which approaches failed, and which solutions Ditto had developed to make them work efficiently in the field. That knowledge allowed Plummer and Defense Unicorns to skip years of trial and error.

36.    The functional similarities are striking on their own. But Defense Unicorns' open-source GitHub repository removes any doubt that Ditto's proprietary information was used. Although some of Defense Unicorns' GitHub repository utilizes known software terms such as CRDT, mDNS, BLE, or FFI, PEAT's modules also follow Ditto's internal naming conventions, which are not publicly available, unequivocally establishing that its repository was derived from the confidential and trade secret information of Ditto. The correspondence between PEAT's module names and Ditto's internal names is shown below:

| Concept | PEAT Name | Ditto Name |
|---|---|---|
| Discovery | `peat-discovery` | `ditto-discovery-mdns` |
| Transport (HTTP) | `peat-transport` | `ditto-transport-*` |
| Store | `peat-persistence`/`DittoStore` | `ditto-store`/`Store` |
| BLE | `peat-btle` | `ditto-transport-ble` |
| Sync | `peat-protocol/sync/` | `ditto-sync-docs` |
| Mesh | `peat-mesh` | `ditto-mesh-topology` |
| FFI | `peat-ffi` | `dittoffi` |
| Protocol | `peat-protocol` | `ditto-protocol` |

14

37.    In addition, until recently, when Ditto alerted Defense Unicorns to its improper use of Ditto information, Defense Unicorns' GitHub repository contained references to the integrations and software wrapper Ditto developed for the Defense Innovation Unit connecting L3 Harris's DiSCO and SeaSats' LightFish, across U.S. government contracts, including under Small Business Innovation Research ("SBIR") projects, that Plummer worked on while employed at Ditto. DiSCO, which stands for Distributed Spectrum Collaboration and Operations, is an electronic warfare platform developed by L3 Harris. SeaSats develops USVs, or Unmanned Surface Vehicles, such as LightFish. An image of PEAT's reference to these projects is below:



38.    These Ditto integrations are governed by non-disclosure agreements as well as strict confidentiality provisions under U.S. government contracts awarded to

Ditto; as such, Plummer had no right to disclose the details of those projects to Defense Unicorns, and certainly no right to use them for Defense Unicorns' commercial benefit.

39.     Nevertheless, Defense Unicorns' PEAT implementation used the same highly confidential architecture, data model, exercise scenario, and Ditto integration program identifiers that Plummer had worked on under these government contracts while employed by Ditto.

***Plummer and Defense Unicorns' Breach of Ditto's Trial Subscription Agreement***

40.     Ditto issues a limited number of license tokens/keys as offline tokens, which allow customers to access Ditto resources even when disconnected from the internet. Once offline tokens are issued, Ditto has no visibility into how they are used. As a result, Ditto maintains strict policies and procedures regarding the issuance of any offline tokens.

41.     To apply for an offline token, a customer must submit a formal request to Ditto. Ditto then reviews the request and assesses the requestor and reason for the request, including by consulting with the relevant Ditto account executive. Only once that assessment is complete does Ditto authorize issuance of an offline token.

42.     Once such a token is issued, the users of Ditto's software and services are bound by Ditto's Trial Subscription Agreement (https://www.ditto.com/legal/trial-subscription-terms) unless the parties enter into

a separate commercial agreement. A true and correct copy of the Trial Subscription Agreement is attached as Exhibit 3 and incorporated by reference. Under the Trial Subscription Agreement, use of Ditto's software, License Tokens (including offline tokens), and online documentation are strictly limited for the purpose of "(a) developing prototype non-production use applications that utilize the Software or the Cloud Service, or both, and (b) evaluating whether to purchase products or services from [Ditto.]" Exhibit 3 § 2. Under the Trial Subscription Agreement, users acknowledge that License Tokens are "not for production use." Exhibit 3 § 2. And use of Ditto's Software to "create derivative works of the Software or Cloud Service," "reverse engineer the Software or the Cloud Service," "attempt to derive any source code," "hack or modify any License Token, or try to avoid or change any license registration process [Ditto] may implement" is strictly prohibited. Exhibit 3 § 5.

43.     The Trial Subscription Agreement further requires users not to "disclose or permit any third party to use the Materials" or "use or copy the Materials in a manner not expressly permitted by this Agreement, including any use or copying in connection with a product or service that competes with the Software or the Cloud Service." Exhibit 3 § 5.

44.     Plummer was aware of these obligations and restrictions under the Trial Subscription Agreement. He received Ditto internal documentation and viewed a

17

Ditto internal video making it clear that Ditto's License Tokens, including offline tokens, were valuable Ditto intellectual property and were to be treated as highly confidential. Plummer also knew that "Super Admin" access was required to issue offline tokens, a status that only a select number of Ditto employees were granted based on the needs of their role.

45. Plummer was one such employee who was granted Super Admin access in connection with his work for Ditto. He used those rights to create 36 offline tokens using his Ditto email account.

46. However, Plummer's personal email account had also been accidentally granted "Super Admin" access. On August 1, 2023, upon Ditto's discovery of this mistake, Plummer was immediately instructed to remove the Super Admin access and provided instructions for doing so. That same day, Plummer acknowledged his obligation to remove his Super Admin access from his personal email account. He never did.

47. Instead, after he left Ditto, Plummer created two offline tokens from his personal email account using the Super Admin access he was supposed to have removed—one on September 26, 2025 and one on October 28, 2025. He bypassed Ditto's review process entirely, creating both tokens without Ditto's knowledge and without submitting any request for approval—thereby avoiding Ditto's license

18

registration process and in effect hacking Ditto's License Tokens, in violation of the terms of the Trial Subscription Agreement.

48. Once created, those offline tokens operated in the dark—Ditto had no window into how they were being used. Ditto discovered one of them only when it surfaced publicly, committed to Defense Unicorns' PEAT open-source GitHub repository.

49. Those offline tokens gave Plummer and Defense Unicorns access to Ditto's technology, specifically Ditto's SDKs, without restriction, something no competitor is supposed to have. This access allowed Plummer and Defense Unicorns to test their own HIVE/PEAT source code on Ditto's platform, without Ditto's knowledge.

50. By using Ditto's stolen offline tokens, Plummer and Defense Unicorns built a product that mirrored Ditto's trade secret architecture and worked as a wrapper to Ditto's product, all in violation of the Trial Subscription Agreement, without entering into a paid subscription model under Ditto's standard commercial terms, and without paying the licensing fees required for this type of use case and access to Ditto's infrastructure.

***When Confronted, Defendants Provide Misleading Information***

51. When Ditto raised its concerns to Defense Unicorns regarding its use of former Ditto employees to build competing technology on March 26, 2026,

19

Defendants embarked on a campaign to systematically destroy evidence of their wrongdoing.

52.    On April 1, 2026, six days after Ditto raised its concerns and before responding to Ditto, Plummer deleted a "CAP" (which stands for consistency, availability, and partition tolerance) application that Plummer had issued himself in Ditto's portal.

53.    When confronted with this evidence, Plummer claimed he had no knowledge of how or why the CAP application program was deleted and suggested that Ditto itself was responsible for its deletion. Plummer's feigned ignorance is belied by the fact that Plummer's personal email account was used to delete the CAP application in Ditto's login authentication logs on April 1, 2026.

54.    Also on April 1, 2026, Plummer pushed a commit to remove Ditto's offline token from Defense Unicorns' public PEAT source code repository. However, references to the offline token remain in Defense Unicorns' publicly available code. A screenshot showing Ditto's offline token embedded in Defense Unicorns' code appears below:



peat / cap-sim / .env.example

3 people  E8: Network Simulation Infrastructure - ContainerLab validated (pause... •••        d9d4c3e · 6 months ago

Code   Blame   13 lines (10 loc) · 777 Bytes                                                    Raw

1      # Ditto Configuration for CAP Simulation
2      # Copy this to .env and fill in your credentials from Ditto portal
3      #
4      # Get credentials from: https://portal.ditto.live/
5
6      # Application ID (UUID format)
7      DITTO_APP_ID=264cc1bf-d2e7-48e7-988b-9bf8c7b0f6aa
8
9      # Offline license token (long base64 string)
10     DITTO_OFFLINE_TOKEN=o2d1c2VyX2lkeBg2M2UwNjYxNjYzOWEzMzQxODQ3ZTRiOWVmZXhwaXJ5eBgyMDI2LTEwLTI2VDAzOjU5OjU5Ljk5OVppc2lnbmF0dXJleFh3WTlBMzRoWSsweFV2NlNhWW
11
12     # Shared encryption key (base64 string)
13     DITTO_SHARED_KEY=MIGHAgEAMBMGByqGSM49AgEGCCqGSM49AwEHBG0wawIBAQQg1hq4xWsVi5bH6+79rs6rRC1s4LjN7eRc6iT7Cd5kFzuhRANCAAR/D/wCWLmZ2XJG8DvUaqKwOXAZ+vVW6jZCn

55.    Given what is visible in Defense Unicorns' public GitHub repository, Ditto has substantial reason to believe that Ditto's trade secret information persists in Plummer and Defense Unicorns' possession, including in their non-public source code.

56.    In sum, Defendants' theft of Ditto's confidential, proprietary, and trade secret information has already impaired, and threatens to further impair, the value of the products and innovations Ditto has developed through years of hard work and significant expense.

***Plummer Tries to Recruit Ditto Employees Away from Ditto***

57.    Plummer's misconduct did not stop at trade secret theft. Since he left Ditto, Plummer has also contacted Ditto employees in an effort to recruit those employees to leave Ditto.

58.    In violation of the non-solicitation provisions in his Confidentiality Agreement and Separation Agreement, Plummer contacted certain Ditto employees

via Signal and other platforms, promoting his work at Defense Unicorns and encouraging those employees to join Defense Unicorns to help build products that compete with Ditto.

59.    On information and belief, at least one of those recruitment efforts succeeded. Austin Ruth, a former Ditto employee, is now a co-author of Defense Unicorns' PEAT source code.

60.    Plummer also targeted other Ditto employees, attempting to draw them into his trade secret misappropriation venture at Defense Unicorns. Those efforts have been unsuccessful to date.

## FIRST CLAIM FOR RELIEF

### Misappropriation of Trade Secrets,
### Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
### (Against Defense Unicorns and Plummer)

61.    Ditto incorporates all of the above paragraphs as though fully set forth herein.

62.    As set forth above, Defendants improperly acquired, retained, and/or used confidential and proprietary information of Ditto constituting trade secrets as defined by 18 U.S.C. § 1839(3), including without limitation: (a) the specific manner in which Ditto implements its mesh architecture within its own system, including Ditto's particular implementation of edge synchronization, routing, transport, discovery, persistence, and conflict-resolution functionality, developed over years

22

of engineering investment; (b) Ditto's proprietary source code and repository history, including code relating to mesh networking and CoT/TAK bridge functionality; (c) Ditto's negative know-how, such as the non-public record of the approaches, designs, and configurations Ditto tried and rejected, and the workarounds and fixes Ditto developed through years of real-world deployment; (d) Ditto's implementation-specific systems, including its DQL query language, its CoT/TAK bridge and TAK Edge Sync plugin, its offline-token and credential infrastructure, its autonomous systems designs and mesh synchronization within the Common Operational Dataase (COD), and its DiSCO and LightFish integrations; (e) Ditto's internal technical documentation, product roadmaps, and integration specifications; and (f) Ditto's customer and pipeline information, operational know-how, and other competitively sensitive business information. Ditto's trade secrets are used in interstate commerce.

63.    In the alternative, even to the extent any individual element identified above was known or readily ascertainable outside Ditto, Ditto's particular selection, arrangement, and integration of those elements within its platform is itself a trade secret. That combination is not generally known to or readily ascertainable by others in the field, and it derives independent economic value from its secrecy.

64.    Ditto's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by,

23

other persons in the field. Those trade secrets are also the product of years of research and development at substantial cost to Ditto.

65.    Ditto has undertaken reasonable efforts to maintain the secrecy of the trade secrets at issue. Those efforts include, but are not limited to, the use of passwords, encryption, and other access control measures to protect data on its computers and servers, limiting distribution of trade secret information to employees, and requiring all employees to sign confidentiality agreements. Ditto also maintains written policies and procedures that instruct employees regarding their duties to maintain the secrecy of Ditto's trade secrets and require the use of confidentiality and non-disclosure agreements when working with vendors, customers, partners, contractors, and employees to maintain the secrecy of Ditto's trade secret information.

66.    Defendants have misappropriated, and are continuing to misappropriate, Ditto's trade secrets by, among other actions, using Ditto's trade secret information to develop, test, and market Defense Unicorns' PEAT product.

67.    This misappropriation includes, but is not limited to, using Ditto's confidential database implementation strategies and negative know-how, which Ditto developed through experience designing, developing, testing, and deploying its database product in the field.

24

68.    Defendants' improper acquisition and use of Ditto's trade secrets, actual or threatened, violate the Defend Trade Secrets Act.

69.    As a direct and proximate result of Defendants' conduct, Ditto has been injured, and will continue to suffer injury, in an amount that will be proven at trial. Ditto has incurred, and will continue to incur, damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation.

70.    Additionally, as a proximate result of its misappropriation of Ditto's trade secrets, Defense Unicorns has been unjustly enriched.

71.    As described herein, Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.

72.    As a direct and proximate result of Defendants' wrongful conduct, Ditto has been and continues to be irreparably harmed and, therefore, is entitled to preliminary and permanent injunctive relief.

## SECOND CLAIM FOR RELIEF

**Misappropriation of Trade Secrets
Georgia Trade Secrets Act, O.C.G.A. § 10-1-761 *et seq.*
(Against Defense Unicorns and Plummer)**

73.    Ditto incorporates all of the above paragraphs as though fully set forth herein.

25

74. The Georgia Trade Secrets Act prohibits misappropriation of trade secrets and authorizes legal actions to enjoin actual or threatened misappropriation and to recover damages for the actual loss caused by misappropriation.

75. As set forth above, Defendants improperly acquired, retained, and/or used confidential and proprietary information of Ditto constituting trade secrets as defined by O.C.G.A § 10-1-761, including without limitation: (a) the specific manner in which Ditto implements its mesh architecture within its own system, including Ditto's particular implementation of edge synchronization, routing, transport, discovery, persistence, and conflict-resolution functionality, developed over years of engineering investment; (b) Ditto's proprietary source code and repository history, including code relating to mesh networking and CoT/TAK bridge functionality; (c) Ditto's negative know-how, such as the non-public record of the approaches, designs, and configurations Ditto tried and rejected, and the workarounds and fixes Ditto developed through years of real-world deployment; (d) Ditto's implementation-specific systems including its DQL query language, its CoT/TAK bridge and TAK Edge Sync plugin, its offline-token and credential infrastructure, and its DiSCO and LightFish integrations; (e) Ditto's internal technical documentation, product roadmaps, and integration specifications; and (f) Ditto's customer and pipeline information, operational know-how, and other competitively sensitive business information.

76.    In the alternative, even to the extent any individual element identified above was known or readily ascertainable outside Ditto, Ditto's particular selection, arrangement, and integration of those elements within its platform is itself a trade secret. That combination is not generally known to or readily ascertainable by others in the field, and it derives independent economic value from its secrecy.

77.    The information that Defendants misappropriated derives independent economic value to Ditto from the fact that it is not generally known to the public or to Ditto's competitors who could obtain economic value from its disclosure or use. The information is also subject to reasonable efforts by Ditto to maintain its secrecy, including contractual obligations and physical, technical, and administrative security protections.

78.    Defendants have misappropriated, and are continuing to misappropriate, Ditto's trade secrets by, among other actions, using Ditto's trade secret information to develop, test, and market Defense Unicorns' PEAT product.

79.    This misappropriation includes, but is not limited to, using Ditto's confidential database implementation strategies and negative know-how, which Ditto developed through experience designing, developing, testing, and deploying its database product in the field.

80.    Defendants' improper acquisition and use of Ditto's trade secrets violate the Georgia Trade Secrets Act.

27

81. As a direct and proximate result of Defendants' misappropriation of Ditto's trade secrets, Ditto has suffered and will continue to suffer significant damages in an amount to be determined at trial. Ditto has incurred, and will continue to incur, damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation.

82. Additionally, as a proximate result of its misappropriation of Ditto's trade secrets, Defense Unicorns has been unjustly enriched.

83. As described herein, Defendants' conduct has been willful and malicious, justifying an award of exemplary damages.

84. As a direct and proximate result of Defendants' wrongful conduct, Ditto has been and continues to be irreparably harmed and, therefore, is entitled to preliminary and permanent injunctive relief.

## THIRD CLAIM FOR RELIEF

### Breach of Contract
### (Against Plummer)

85. Ditto incorporates all of the above paragraphs as though fully set forth herein.

86. Plummer was bound by the Confidentiality Agreement, which he signed with an effective date of March 1, 2023. He was also bound by the Separation Agreement, which he signed on September 29, 2025. The terms of the

Confidentiality Agreement and Separation Agreement were sufficiently clear that the parties understood what each of them was required to do.

87. In the Confidentiality Agreement, Plummer agreed that "a breach or threatened breach of this agreement may cause [Ditto] to suffer irreparable harm and that [Ditto] will therefore be entitled to injunctive relief to enforce this Agreement." Exhibit 1 § 17.

88. Ditto has performed all promises, obligations, and conditions imposed on it under the Confidentiality Agreement and Separation Agreement, except those excused by law or otherwise.

89. In breach of his obligations under the Confidentiality Agreement and Separation Agreement, Plummer, (a) took confidential, proprietary, and trade secret information and failed to return that information upon his resignation from Ditto; (b) disclosed Ditto's confidential, proprietary, and trade secret information to his new employer, Defense Unicorns; and (c) failed to "return to the Company, in good working condition, all Company property and equipment that is in Employee's possession or control." Exhibit 1 § 9; Exhibit 2 ¶ 6.

90. In breach of his obligations under the Separation Agreement, Plummer has contacted Ditto employees within one year of his separation from Ditto for the purpose of soliciting them to leave Ditto and join Defense Unicorns. Exhibit 2 ¶ 6.

91.    As a direct and proximate result of Plummer's breach of the Confidentiality Agreement and Separation Agreement, Ditto has suffered monetary and non-monetary injury and harm in an amount to be determined at trial.

92.    As a direct and proximate result of Plummer's breach of the Confidentiality Agreement and Separation Agreement, Ditto has been and continues to be irreparably harmed and, therefore, is entitled to preliminary and permanent injunctive relief without any requirement to post bond.

## FOURTH CLAIM FOR RELIEF

### Breach of Contract
### (Against Defense Unicorns and Plummer)

93.    Ditto incorporates all of the above paragraphs as though fully set forth herein.

94.    In the absence of a separate commercial agreement between Ditto and a third party, a third party's use of Ditto's software, Cloud Service, and License Tokens is governed by Ditto's Trial Subscription Agreement. The Trial Subscription Agreement provides rights to access and use Ditto's software, License Tokens, and Cloud Service solely for the purpose and in the manner explicitly spelled out in its Permitted Use provision, namely for "evaluating whether to purchase products or services from [Ditto]...not for production use" or commercial use. It further restricts users from "hack[ing] or modify[ing] any License Token, or try[ing] to avoid or change any license registration process [Ditto] may implement." As such, a third

30

party is only permitted to access and use a Ditto License Token if the third party submits a request for a License Token and Ditto then provisions the License Token, not by a third party using unauthorized privileged access to provision its own License Token.

95.    The Trial Subscription Agreement requires users not to "disclose or permit any third party to use the Materials" or "use or copy the Materials in a manner not expressly permitted by this Agreement, including any use or copying in connection with a product or service that competes with the Software or the Cloud Service." Exhibit 3 § 5.

96.    The Trial Subscription Agreement prohibits use of Ditto's software to "create derivative works of the Software or Cloud Service," "reverse engineer the Software or the Cloud Service," or "attempt to derive any source code." Exhibit 3 § 5.

97.    Ditto has performed all promises, obligations, and conditions imposed on it under the Subscription Agreement, except those excused by law or otherwise.

98.    Plummer breached the Trial Subscription Agreement by disclosing Ditto Materials, including the License Token, to Defense Unicorns, including as evidenced below:



```
peat / cap-sim / .env.example

    3 people   E8: Network Simulation Infrastructure - ContainerLab validated (pause...  ⋯          d9d4c3e · 6 months ago

  Code   Blame   13 lines (10 loc) · 777 Bytes                                                                    Raw

   1     # Ditto Configuration for CAP Simulation
   2     # Copy this to .env and fill in your credentials from Ditto portal
   3     #
   4     # Get credentials from: https://portal.ditto.live/
   5
   6     # Application ID (UUID format)
   7     DITTO_APP_ID=264cc1bf-d2e7-48e7-988b-9bf8c7b0f6aa
   8
   9     # Offline license token (long base64 string)
  10     DITTO_OFFLINE_TOKEN=o2d1c2VyX2lkeBg2M2UwNjYxNjYzOWEzMzQxODQ3ZTRiOWVmZXhwaXJ5eBgyMDI2LTEwLTI2VDAzOjU5OjU5Ljk5OVppc2lnbmF0dXJlFh3WTlBMzRoWSsweFV2NlNhWW
  11
  12     # Shared encryption key (base64 string)
  13     DITTO_SHARED_KEY=MIGHAgEAMBMGByqGSM49AgEGCCqGSM49AwEHBG0wawIBAQQg1hq4xWsVi5bH6+79rs6rRC1s4LjN7eRc6iT7Cd5kFzuhRANCAAR/D/wCWLmZ2XJG8DvUaqKw0XAZ+vVW6jZCr
```

99.    Defense Unicorns and Plummer breached the Trial Subscription Agreement by using and/or copying Ditto Materials when developing Defense Unicorns' PEAT platform.

100.   As a direct and proximate result of Defense Unicorns and Plummer's breaches of the Trial Subscription Agreement, Ditto has suffered damages in an amount to be determined at trial.

101.   As a direct and proximate result of Defense Unicorns and Plummer's breaches of the Trial Subscription Agreement, Ditto has been and continues to be irreparably harmed and, therefore, is entitled to preliminary and permanent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Ditto prays for judgment against Defense Unicorns and Plummer as follows:

a. Judgment in favor of Ditto and against Defendants on Ditto's claims for relief alleged in this Complaint;

b. For injunctive relief, including but not limited to a preliminary injunction and a permanent injunction, prohibiting Defendants, and all those acting on their behalf or in active concert or participation with them, from accessing, possessing, using, disclosing, or transmitting Ditto's trade secrets;

c. For injunctive relief, including but limited to a preliminary injunction and a permanent injunction, prohibiting Plummer from breaching his obligations under his Confidentiality Agreement and Separation Agreement;

d. For injunctive relief, including but not limited to a preliminary injunction and a permanent injunction, prohibiting Defendants from breaching the Trial Subscription Agreement;

e. For an award of damages in an amount to be determined at trial;

f. For an award of restitution in an amount to be determined at trial;

g.    For an award of exemplary damages in an amount to be determined at trial;

h.    For an order requiring Defendants to disgorge any wrongfully obtained profits or pecuniary gain;

i.    For an award of attorneys' fees;

j.    For an award of costs of suit;

k.    For an award of pre- and post-judgment interest according to law; and

l.    For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Ditto demands a trial by jury for all of its claims in this action to the extent authorized by law.

Dated: July 9, 2026

/s/ Robin L. McGrath
Robin L. McGrath
robinmcgrath@quinnemanuel.com
Georgia Bar No. 493115
Y. Leon Lin
leonlin@quinnemanuel.com
Georgia Bar No. 770201
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, Georgia 30328
(404) 482-3502

David Eiseman
*Pro Hac Vice Forthcoming*
davideiseman@quinnemanuel.com
Victoria B. Parker
*Pro Hac Vice Forthcoming*
vickiparker@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600

*Attorneys for Plaintiff DittoLive, Inc.*

35

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1(C)</u>

I hereby certify that the foregoing has been prepared with one of the font and point selections approved by the Court in Rule 5.1(C) of the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, specifically Times New Roman 14 point.

Respectfully submitted this 9th day of July 2026,

*/s/ Robin L. McGrath*
Robin L. McGrath